PHILLIP WHITEAKER, Judge
The appellants, Joseph Roberson and Tawny Roberson, filed a complaint in the Boone County Circuit Court against James Roberson (Jim), the appellee. They sought an order funding an irrevocable credit shelter trust (CST), under the terms of the Roberson Living Trust (the Trust) and requested that the court declare the first amendment (First Amendment) to the Trust invalid. The court entered judgment dismissing their complaint. They appeal, arguing that the court erred in entering this judgment. We reverse the judgment and remand the case to the circuit court.
*740 I. Background
Joe Roberson, Sr., (Joe Sr.) and Cleo Roberson were husband and wife. They were the parents of five children, including twin sons, Jim Roberson and Joe Roberson, Jr. (Joe Jr.).[1] Joe Jr. is the father of Joseph and Tawny. In 1972, Joe Sr. and Cleo purchased over 1800 acres of farmland in Omaha, in Boone County, Arkansas. They used the land primarily to raise cattle. Jim joined the farm operation at its inception. Joe Jr. later joined the operation with his wife, René. Joe Jr. and René lived and worked on the farm for approximately two years, however, before Joe Jr. obtained employment with the United States Department of Agriculture (USDA) in California. After the move to California, Joe Jr. returned to the farm in the summer to help while Jim remained and helped his parents run the farm.
Joe Sr. suffered a heart attack in 1993. Soon after, he and Cleo made Jim a partner in the farming operation because he had lived and worked on the farm with his parents for over twenty years. They also executed a quitclaim deed giving Jim a one-half interest in the farmland in Omaha.
Three years later, in June 1996, Joe Sr. and Cleo executed the Trust. Joe Sr. and Cleo were the trust grantors, the original trustees, and the primary beneficiaries of the Trust. Joe Sr. and Cleo mandated, among other things, in article two, subsection A, that upon the death of either, the surviving spouse "shall" fund a separate CST to take advantage of the $600,000 estate-tax exemption that existed at the time.[2] They named Jim as the successor trustee of the CST and directed a plan of distribution for the CST. Joe Sr. and Cleo specifically provided in article two, section A, that upon the death of the survivor of Joe Sr. and Cleo, the farm land would go to Jim and Joe Jr. as tenants in common, taking into consideration any previous transfers of land to Jim. Joe Sr. and Cleo specifically stated the intent of the CST plan of distribution was to equalize the amount of farmland passing to each son and directed that any asset of Jim or Joe Jr. would pass to his issue by representation if either Jim or Joe Jr. predeceased Joe Sr. or Cleo. Joe Sr. and Cleo made the plan of distribution and all the terms of the CST irrevocable and unamendable upon the death of either Joe Sr. or Cleo.[3] Joe Sr. died in April 1997. Cleo never funded the CST despite the mandatory language in the article two, section A.
In September 2000, Joe Jr. told his family that he had terminal brain cancer. Approximately one month later, Cleo executed the First Amendment to the Trust. In this amendment, Cleo deleted the identical plans of distribution in the Credit Shelter Trust and the Roberson Living Trust which gave the land to Jim and Joe Jr. as tenants in common. Instead, she directed that upon her death the successor trustee conveys any remaining interest in the farm to Jim. Within a few months of the execution of the First Amendment, Joe Jr. died in April 2001. Joseph and Tawny, his children, are his surviving heirs.
*741 Cleo died in June 2011. After her death and pursuant to the terms of the First Amendment, Jim, as the successor trustee, executed a deed transferring his parents' share of the farmland, which had been held in the Trust, to himself.
Joseph and Tawny filed a complaint against Jim arguing that Cleo, their grandmother, was required to transfer the farmland to the CST when Joe Sr. died, that the terms of the CST created an irrevocable and unamendable plan of distribution, and that they were entitled to their father's distribution of the farmland as his descendants. They further argued that the First Amendment was invalid.
The circuit court dismissed Joseph and Tawny's claims, concluding that the plain language of the Trust indicated that Cleo was not obligated to fund the CST at Joe Sr.'s death; therefore, she was free to amend the plans of distribution under the CST and the Trust. The circuit court also found that Joe Sr. and Cleo executed the Trust with the intent to keep the farmland intact and within the family after their deaths, or in other words, free from the influence of their daughter-in-law, René Roberson.
II. Standard of Review
This appeal concerns the construction, interpretation, and operation of a trust. The courts of equity have exclusive jurisdiction in cases involving matters of the construction, interpretation, and operation of trusts. Cason v. Lambert , 2015 Ark. App. 41, at 4, 454 S.W.3d 250, 253. We conduct a de novo review on the record of matters that sound in equity and will not reverse a finding by a circuit court in an equity case unless it is clearly erroneous. Id. A finding is clearly erroneous when, even though there is some evidence to support it, the appellate court is left with the definite and firm conviction that a mistake has been made. Le v. Nguyen , 2010 Ark. App. 712, at 12, 379 S.W.3d 573, 580.
III. Discussion
Joseph and Tawny make three arguments on appeal. First, they contend that the circuit court erred by concluding that the language of the Trust gave Cleo the option to avoid funding the CST at Joe Sr.'s death. Second, they allege that because the CST was expressly "unamendable and irrevocable" upon the death of Joe Sr., the circuit court erred by concluding that the terms of the Trust gave Cleo the power to amend the plan of distribution. Third, they argue that the circuit court erred when it concluded that Joe Sr. and Cleo executed the Trust with the intention to "keep the farm intact and within the family."
Joseph and Tawny first argue that the plain language of the Trust evinces Joe Sr. and Cleo's intent to protect their assets from the estate tax, and that tax-saving intent, as well as the mandatory language in article two, Section A, forecloses any interpretation that would have allowed Cleo the option not to fund the CST. Jim argues that the circuit court's judgment is not clearly erroneous and should be upheld. He states that article one of the Trust gave Cleo the option to not fund the CST. We conclude that the plain language of the Trust required Cleo to fund the irrevocable and unamendable CST at Joe Sr.'s death. Thus, we reverse and remand.
We set forth some basic rules of trust construction to support our conclusion. A court construing a trust applies the same rules applicable to the construction of a will, and "the paramount principle" in the interpretation of wills is that the intention of the testator, or trust settlor, governs. Aycock Pontiac, Inc. v. Aycock , 335 Ark. 456, 463, 983 S.W.2d 915, 919 (1998). The settlor's intention "is to be determined *742 from viewing the four corners of the instrument, considering the language used, and giving meaning to all of its provisions, whenever possible." Id. Further, "the court should give force to each clause of the [trust], and only when there is irreconcilable conflict between two clauses must one give way to the other." Id. , at 463, 983 S.W.2d at 919-20. In the event of a conflict, "the last clause in the trust governs the determination of the settlor's intent." Id. Finally, "[t]he court may read the language used by the [settlor] in light of the circumstances existing when the [trust] was written, but only if there is uncertainty about the [settlor's] intentions from looking at the language used in the [trust]." Id. , 335 Ark. at 463, 983 S.W.2d at 919 (emphasis in original).
We now turn our attention to the specific language and provisions of the Trust. Article two, section A states
[u]pon the death of either of us, debts of [the] decedent, debts of the surviving trustmaker, debts of this trust, and expenses of the last illness and funeral expenses of the decedent trustmaker shall be paid. After said debts and expenses are paid our Successor Trustee(s) shall divide the net proceeds of the living trust into separate parts; one part which shall constitute a separate trust, and one part which shall remain in this living trust with the surviving trustmaker as primary trustee and primary beneficiary. The separate trust shall be referred to as the Credit Shelter Trust
This language of article two, section A is mandatory, providing that the successor trustee-Cleo in this case-shall divide the net proceeds of the Trust into a separate trust that shall be called the CST. Article two, subsection A also provides, as relevant here, that Joe Sr. and Cleo "give to James Roberson, as trustee(s) of the Credit Shelter Trust to hold in a trust known as the Credit Shelter Trust an amount equal to the largest amount which can pass free of federal estate tax on the estate of the decedent trustmaker[.]" Additionally, article two, section A, takes control of the assets of the CST away from the surviving spouse, appointing Jim as special co-trustee, giving him the sole "right and power" and "discretion" to distribute the principal of the CST to the surviving spouse, and declaring that "[n]otwithstanding any other provisions of this Living Trust, under no circumstances shall the surviving spouse act as the sole trustee of the Credit Shelter Trust." We conclude that this language leaves no doubt that Joe Sr. and Cleo intended to maximize the amount of their assets that would qualify for the estate-tax exemption, and it imposes a fiduciary obligation on their survivor to protect their assets from the estate tax. Consequently, Cleo did not have the option to avoid funding the CST when Joe Sr. died.
We now turn our attention to article one. Article one, which provides the name of the trust and appoints trustees, designates Joe Sr. and Cleo as primary trustees of the Trust and provides in section B that
[e]ither or both of us may exercise dominion or control over any and all of the trust assets. Upon the death of one of us the survivor shall continue to act as the primary trustee of this trust with full power and authority to deal with any and all of the assets of this trust in any manner that said survivor sees fit. During the existence of this trust each trustmaker shall have the right to partition, enabling each trustmaker to restrict, transfer, or withdraw one-half of the assets in this trust.
(Emphasis added.) Article one also appoints Jim as the successor trustee for the *743 Trust, and it further provides in section L that Joe Sr. and Cleo
[h]ereby designate ourselves as the primary beneficiaries of this trust. As long as we or both of us shall live, we or the survivor of us will have the exclusive right to the use and benefit of the income and the assets of this trust. Upon the death of the survivor of us, our successor trustee(s) shall take charge of the assets then remaining in this trust and distribute them according to the plan of distribution in Article Two of this Living Trust document.
According to Jim, these provisions gave Cleo the power to control the assets of the Trust as she saw fit, including the option not to fund the CST when Joe Sr. died. Because she chose not to fund the CST, he claims all the Roberson's assets, including the farm, remained in the revocable-and amendable-Trust. We are not persuaded.
Article one, section B is consistent with the language in article two anticipating that the Trust will survive the allocation of assets into the CST. Indeed, article two, section A, mirrors article one, section B, and article one, section L, providing that assets remaining after the funding of the CST "shall remain in this living trust with the surviving trustmaker as primary trustee and beneficiary," and similarly providing in subsection (A)(1)(d) that "[a]ll assets of this living trust not placed in the Credit Shelter Trust shall remain in the living trust and will continue to be governed by the terms, provisions, and conditions of the living trust." Read in this manner, article one, section B, and article one, section L, gave Cleo unfettered power as beneficiary and trustee over only those assets-if any-that remained in the Trust after funding the CST, and not the option against funding the CST altogether.
Jim argues that even if this was the intent of Joe Sr. and Cleo at the execution of the Trust, there is nothing in the Trust that required Cleo to fund the CST with the farm. We disagree. The circuit court had undisputed evidence that the estate-tax exemption at the death of Joe Sr. was $600,000, and that the estimated value of Joe Sr. and Cleo's estate was less than $600,000, including the farm. The language in article two, section A, also contemplates that the farmland will be among the assets in the CST, providing in its "irrevocable" plan of distribution that the farmland will be divided equally between the two sons upon the death of the survivor. As a result, Cleo was obligated to fund the CST at Joe Sr.'s death with assets that included the farm.
We likewise see no indication that Joe Sr. and Cleo executed the Trust in 1996 with the intention of "keep[ing] the farm intact and within the family" or, more to the point, with the intention of protecting the farmland from the influence of René Roberson. Indeed, regarding the distribution of the farmland to Jim and Joe Jr., the plain language of the trust provides only that "the intent ... is to equalize the amount of farm land passed to each son." The provisions immediately following also unambiguously state what is to happen when, as actually occurred, "[a] beneficiary named [in the trust] to receive a specific asset does not survive the survivor" of Joe Sr. and Cleo. In that event, the asset is given to "that beneficiary's issue by representation." If Joe Sr. and Cleo intended to foreclose any possibility that René Roberson would influence the fate of her children's share of the farmland, they could have provided Jim or Joe Jr.'s share of the farmland would pass to the surviving brother if one of them predeceased Joe Sr. or Cleo. They did not; and Cleo's intent at the time that she executed the First Amendment-apparently to protect the farmland from the influence of *744 René Roberson-is not consistent with her or Joe Sr.'s intent as expressed at the time the Trust was executed in 1996-which must control. Because the circuit court found otherwise, we must reverse and remand.
IV. Conclusion
The four corners of the Trust demonstrate that Joe Sr. and Cleo Roberson intended for their survivor to establish and fund an irrevocable CST when one of them died. Moreover, the mandatory terms of the Trust left Cleo, as the survivor, no option against funding the CST, or amending its "irrevocable and unamendable" plan of distribution. Accordingly, we reverse and remand the case to the circuit court for further proceedings.
Reversed and remanded.
Gruber, C.J., and Virden, J., agree.

Joe Sr. and Cleo had three daughters who lived outside Arkansas, are not parties to this appeal, and did not have any involvement in the farming operation at issue in this appeal.

More specifically, article two, section A provides that Joe Sr. and Cleo placed an amount equal to the largest amount that could pass free of federal estate tax into the Credit Shelter Trust, with all assets not placed into the Credit Shelter Trust remaining in the Revocable Living Trust.

The Trust contained a plan of distribution that mirrored the CST plan of distribution, except it did not contain the "irrevocable and unamendable" language.